376 F.3d 841
 Seth SWIRSKY, an individual d/b/a Julian's Dad; Warryn Campbell, Plaintiffs-Appellants,
v.
Mariah CAREY; James Harris, III; Terry Lewis; Flyte Time Productions, Inc., an entity of unknown designation, e/s/a Flyte Tyme Tunes, Inc.; ATV Songs LLC; Rye Songs; Columbia Records; Sony Music Entertainment, Inc.; EMI April Music, Defendants-Appellees.
 No. 03-55033.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted February 3, 2004.
 Filed July 12, 2004.
 As Amended on Denial of Rehearing August 24, 2004.
 
 COPYRIGHT MATERIAL OMITTED Jonathan D. Freund (argued), Craig A. Huber, Freund & Brackey LLP, Beverly Hills, CA, for the plaintiffs-appellants.
 Robert M. Dudnik, Mitchell, Silberberg & Knupp, LLP, Los Angeles, CA, for the defendants-appellees.
 Appeal from the United States District Court for the Central District of California; Christina A. Snyder, District Judge, Presiding. D.C. No. CV-00-09926-CAS.
 Before CANBY, JR., NOONAN, and THOMAS, Circuit Judges.
 CANBY, Circuit Judge.
 
 
 1
 The plaintiffs, Seth Swirsky and Warryn Campbell, brought this action in district court, alleging that a song produced by the defendants infringed the plaintiffs' copyright in the song, "One of Those Love Songs." The defendants moved for summary judgment, contending that the plaintiffs' evidence failed to meet this circuit's threshold "extrinsic test" for substantial similarity of works. The district court granted the motion, holding that the plaintiffs' expert had failed to show by external, objective criteria that the two songs shared a similarity of ideas and expression. Plaintiffs appeal. We conclude that the plaintiffs' expert's evidence was sufficient to present a triable issue of the extrinsic similarity of the two songs, and that the district court's ruling to the contrary was based on too mechanical an application of the extrinsic test to these musical compositions. We also conclude that the district court erred in ruling portions of plaintiffs' song to be unprotectable by copyright as a matter of law. We accordingly reverse the summary judgment.
 
 
 Factual Background
 
 
 2
 This case concerns the alleged similarity between the choruses of two popular and contemporary rhythm and blues ("R & B") songs: plaintiffs'"One of Those Love Songs" ("One") and Mariah Carey's "Thank God I Found You" ("Thank God"). One was jointly composed by plaintiffs Seth Swirsky and Warryn Campbell (collectively "Swirsky") in 1997. Pursuant to a licensing agreement, One was recorded by the musical group Xscape and released in May 1998 on Xscape's album "Traces of My Lipstick." Thank God was composed by defendants Carey, James Harris III, and Terry Lewis in 1999 and was released on Carey's album "Rainbow" in November 1999.
 
 
 3
 One and Thank God have generally dissimilar lyrics and verse melodies, but they share an allegedly similar chorus that Swirsky claims as an infringement of One's copyright.[1] Swirsky filed this action in district court against Carey, Harris, Lewis, and a number of music companies that had financial interests in Thank God (collectively "Carey") for copyright infringement and related claims.[2] The defendants moved for summary judgment, contending that Swirsky had failed to present a triable issue on the required first, or "extrinsic," part of our circuit's two-part test for the establishment of substantial similarity necessary to sustain a claim of copyright infringement. The defendants also contended that portions of One were not protectable by copyright. The district court agreed with both contentions and granted summary judgment to Carey. Swirsky moved for reconsideration, which the district court denied. This appeal followed.
 
 
 Substantial Similarity
 
 
 4
 We review de novo the district court's grant of summary judgment. See Smith v. Jackson, 84 F.3d 1213, 1218(9th Cir.1996). We may uphold the summary judgment only if we find that "no reasonable juror could find substantial similarity of ideas and expression [between One and Thank God], viewing the evidence in the light most favorable to the nonmoving party." Id. (quoting Kouf v. Walt Disney Pictures & Television, 16 F.3d 1042, 1045 (9th Cir.1994)); Narell v. Freeman, 872 F.2d 907, 909-910 (9th Cir.1989). If Swirsky presented "indicia of a sufficient disagreement concerning the substantial similarity of [the] two works," then the case must be submitted to a trier of fact. Brown Bag Software v. Symantec Corp., 960 F.2d 1465, 1472 (9th Cir.1992) (internal quotations and citation omitted).
 
 
 5
 To establish a successful copyright infringement claim, Swirsky must show that (1) he owns the copyright in One and (2) Carey copied protected elements of One. See Rice v. Fox Broad. Co., 330 F.3d 1170, 1174 (9th Cir.2003) (Rice I); Smith, 84 F.3d at 1218. For purposes of summary judgment, Carey conceded that Swirsky owns a valid copyright in One. The element of copying is rarely the subject of direct evidence; Swirsky may establish copying by showing that Carey had access to One and that Thank God was substantially similar to One in One's protected elements. See Smith, 84 F.3d at 1218; Metcalf v. Bochco, 294 F.3d 1069, 1072(9th Cir.2002). Where a high degree of access is shown, we require a lower standard of proof of substantial similarity. See Three Boys Music Corp. v. Bolton, 212 F.3d 477, 485(9th Cir.2000); Smith, 84 F.3d at 1218. For the purposes of summary judgment, Carey conceded that she had a high degree of access to One.[3] Swirsky's burden of proof of substantial similarity is thus commensurately lowered.
 
 
 6
 In determining whether two works are substantially similar, we employ a two-part analysis: an objective extrinsic test and a subjective intrinsic test. For the purposes of summary judgment, only the extrinsic test is important because the subjective question whether works are intrinsically similar must be left to the jury. See Rice I, 330 F.3d at 1174; Smith, 84 F.3d at 1218. If Swirsky cannot present evidence that would permit a trier of fact to find that he satisfied the extrinsic test, he necessarily loses on summary judgment because a "jury may not find substantial similarity without evidence on both the extrinsic and intrinsic tests." Rice I, 330 F.3d at 1174 (quoting Kouf, 16 F.3d at 1045).
 
 
 7
 The extrinsic test considers whether two works share a similarity of ideas and expression as measured by external, objective criteria.[4] See Smith, 84 F.3d at 1218. The extrinsic test requires "analytical dissection of a work and expert testimony." Three Boys, 212 F.3d at 485. "Analytical dissection" requires breaking the works "down into their constituent elements, and comparing those elements for proof of copying as measured by `substantial similarity.'" Rice v. Fox Broad. Co., 148 F.Supp.2d 1029, 1051 (C.D.Cal.2001), reversed on other grounds, 330 F.3d 1170 (9th Cir.2003) (Rice II). Because the requirement is one of substantial similarity to protected elements of the copyrighted work, it is essential to distinguish between the protected and unprotected material in a plaintiff's work. See Rice I, 330 F.3d at 1174; Apple Computer, Inc. v. Microsoft Corp., 35 F.3d 1435, 1443(9th Cir.1994); Brown Bag, 960 F.2d at 1475-76.
 
 
 8
 The expert testimony on which Swirsky relied was that of Dr. Robert Walser, chair of the Musicology Department at the University of California at Los Angeles. On the basis of his aural assessment[5] of One and Thank God, Dr. Walser opined that the two songs had substantially similar choruses.
 
 
 9
 Dr. Walser admitted that the lyrics and verse melodies of the two songs differed "clearly and significantly," but stated that the two songs' choruses shared a "basic shape and pitch emphasis" in their melodies, which were played over "highly similar basslines[6] and chord changes, at very nearly the same tempo and in the same generic style."[7] Dr. Walser also noted that it was a "suspicious coincidence" that the two songs' choruses were both sung in B-flat. Dr. Walser further testified that the choruses in both One and Thank God shared a similar structure in that measures five through seven of each chorus were "almost exactly" the same as the first three measures of each chorus.
 
 
 10
 Dr. Walser also noted a number of differences between the two songs' choruses. Dr. Walser found that the fourth measures of the choruses were "dramatically different" from each other and noted that while the "basic, emphasized pitches and rhythms" of the basslines were alike, the basslines to both choruses were "ornamented and played slightly differently from chorus to chorus." Dr. Walser also found that certain "text-setting choices"[8] created differences between the two songs' choruses. For example, he noted that in Thank God, Carey sings "D, scale degree three, for a full beat on the first beat of the first measure" while Xscape in One sings the same pitch "divided into two eight-note pulses." Dr. Walser ultimately concluded, however, that these differences were not enough to differentiate the songs because the overall emphasis on musical notes was the same, which "contribute [d] to the impression of similarity one hears when comparing the two songs."
 
 
 11
 Dr. Walser transcribed his aural impressions into a series of visual "transcriptions." Dr. Walser created a transcription of each chorus' pitch sequence, melody,[9] and bassline. Dr. Walser labeled his transcription of the basslines a"reduction" because he transcribed only the "basic, emphasized pitches and rhythms." Dr. Walser thus did not include any bassline notes or pitches he found to be "ornamented" in his transcriptions.[10]
 
 
 12
 The district court found this evidence insufficient to survive a motion for summary judgment for four reasons. First, the district court found that Dr. Walser's expert methodology was flawed. Second, the district court, using its own analysis, found that no triable issue was raised as to the substantial similarity of measures two, three, six, seven, and eight of the two choruses. Third, the district court held that measures one and five of One were scenes a faire,[11] and thus incapable of supporting a finding of infringement. Finally, the district court discounted any similarity between the two choruses based on key, harmony, tempo, or genre because it found no precedent for substantial similarity to be "founded solely on similarities in key, harmony, tempo or genre, either alone or in combination." We disagree with much of the district court's reasoning on all four points and conclude that Swirsky has satisfied the extrinsic test because he has provided "indicia of a sufficient disagreement concerning the substantial similarity of [the] two works." Brown Bag, 960 F.2d at 1472 (internal quotations and citation omitted).
 
 A. Dr. Walser's Methodology
 
 13
 There is nothing inherently unsound about Dr. Walser's musicological methodology in this case. The district court is correct that Dr. Walser's methodology is "selective," in as much as it discounts notes that he characterizes as "ornamental." Dr. Walser, however, explained that the melody (pitch and rhythm) and bassline of a song cannot be divorced from the harmonic rhythm of a song. According to Dr. Walser, notes falling on the beat will be more prominent to the ear than notes falling off the beat. Thus, Dr. Walser opined that, even though measure three of both choruses were not identical in numerical pitch sequence or note selection, they both "emphasize [d] the second scale degree, C, over an A in the bass, resolving to the third scale degree, D, over a D in the bass in the last half of the measure." Dr. Walser provided a comparable analysis for measures one, three, and eight.
 
 
 14
 Similarly, Dr. Walser explained that some artists will ornament their notes in ways that others do not. Dr. Walser testified at deposition that both Carey and Xscape ornament their notes with "melismas" and "appoggiaturas," both of which are technical terms for moving up to the next note and then back again. Dr. Walser testified that he did not notate these ornaments in his transcriptions, or take them into account in his opinion, because he "took that to be a matter of the singer customizing the song and regarded those notes as not structural; they are ornamental." As we said in Newton v. Diamond, 349 F.3d 591 (2003), we can "consider only [the defendant's] appropriation of the song's compositional elements and must remove from consideration all the elements unique to [Plaintiff's] performance." Id. at 595. Dr. Walser's methodology sought to remove notes he perceived as performance-related.
 
 
 15
 To a certain extent, Dr. Walser's methodology does concentrate on how the two choruses sound to his expert ears, which led the district court to conclude that his testimony related to intrinsic and not extrinsic similarity. We do not agree, however, that Dr. Walser's testimony was an intrinsic rather than extrinsic analysis. He was not testifying, as the intrinsic test would require, as to whether subjectively the "ordinary, reasonable person would find the total concept and feel of the [two choruses] to be substantially similar." Three Boys, 212 F.3d at 485(quoting Pasillas v. McDonald's Corp., 927 F.2d 440, 442 (9th Cir.1991)). Instead, he was stating that, although the two choruses are not exactly identical on paper, when examined in the structural context of harmony, rhythm, and meter, they are remarkably similar. We, therefore, cannot accept the district court's conclusion that Dr. Walser did not "adequately explain, based on objective criteria, why [his] particular subset of notes is more important, or more appropriately analyzed, than the other notes present in the songs." The district court erred in completely discounting Dr. Walser's expert opinion.
 
 
 16
 B. The District Court's Measure-by-Measure Analysis
 
 
 17
 The district court also erred by basing its comparison of the two choruses almost entirely on a measure-by-measure comparison of melodic note sequences from the full transcriptions of the choruses.[12] Objective analysis of music under the extrinsic test cannot mean that a court may simply compare the numerical representations of pitch sequences and the visual representations of notes to determine that two choruses are not substantially similar, without regard to other elements of the compositions. Under that approach, expert testimony would not be required at all, for any person untrained in music could conclude that "2-2-2-2-2-2-1-2-1-3" did not match "2-2-4-3-2-3" or that a half-note is not identical to an eighth-note. Certainly, musicological experts can disagree as to whether an approach that highlights stressed notes, as Dr. Walser's does, is the most appropriate way to break down music for substantial-similarity comparison, but no approach can completely divorce pitch sequence and rhythm from harmonic chord progression, tempo, and key, and thereby support a conclusion that compositions are dissimilar as a matter of law. It is these elements that determine what notes and pitches are heard in a song and at what point in the song they are found. To pull these elements out of a song individually, without also looking at them in combination, is to perform an incomplete and distorted musicological analysis.[13]
 
 
 18
 Furthermore, to disregard chord progression, key, tempo, rhythm, and genre is to ignore the fact that a substantial similarity can be found in a combination of elements, even if those elements are individually unprotected. See Satava v. Lowry, 323 F.3d 805, 811 (9th Cir.2003); Apple Computer, 35 F.3d at 1445. Thus, although chord progressions may not be individually protected, if in combination with rhythm and pitch sequence, they show the chorus of Thank God to be substantially similar to the chorus of One, infringement can be found. See Three Boys, 212 F.3d at 485; Satava, 323 F.3d at 811.[14]
 
 
 19
 We recognize the difficulties faced by the district court in this case. We have referred to "the turbid waters of the `extrinsic test' for substantial similarity under the Copyright Act." Metcalf, 294 F.3d at 1071. The application of the extrinsic test, which assesses substantial similarity of ideas and expression, to musical compositions is a somewhat unnatural task, guided by relatively little precedent. Music is an art form that "produces sounds and expresses moods," Debra Presti Brent, The Successful Musical Copyright Infringement Suit: The Impossible Dream, 7 U. Miami Ent. & Sports. L.Rev. 229, 244 (1990), but it does not necessarily communicate separately identifiable ideas. The extrinsic test provides an awkward framework to apply to copyrighted works like music or art objects, which lack distinct elements of idea and expression. Nevertheless, the test is our law and we must apply it. See Smith, 84 F.3d at 1218. The extrinsic test does serve the purpose of permitting summary judgment in clear cases of non-infringement, and it informs the fact-finder of some of the complexities of the medium in issue while guiding attention toward protected elements and away from unprotected elements of a composition.
 
 
 20
 In analyzing musical compositions under the extrinsic test, we have never announced a uniform set of factors to be used. We will not do so now. Music, like software programs and art objects, is not capable of ready classification into only five or six constituent elements; music is comprised of a large array of elements, some combination of which is protectable by copyright.[15] For example, in Three Boys we upheld a jury finding of substantial similarity based on the combination of five otherwise unprotectable elements: (1) the title hook phrase (including the lyric, rhythm, and pitch); (2) the shifted cadence; (3) the instrumental figures; (4) the verse/chorus relationship; and (5) the fade ending. Three Boys, 212 F.3d at 485. Other courts have taken account of additional components of musical compositions, including melody, harmony, rhythm, pitch, tempo, phrasing, structure, chord progressions, and lyrics. See Ellis v. Diffie, 177 F.3d 503, 506(6th Cir.1999) (noting that the district court had compared idea, phraseology, lyrics, rhythms, chord progressions, "melodic contours," structures, and melodies under "ordinary observer" test); Cottrill v. Spears, 2003 WL 21223846, at *9 (E.D.Pa. May 22, 2003) (unpublished disposition) (comparing pitch, chord progression, meter, and lyrics under extrinsic test); Tisi v. Patrick, 97 F.Supp.2d 539, 543 (S.D.N.Y.2000) (analyzing structure, melody, harmony, and rhythm under"striking similarity" test); McKinley v. Raye, 1998 WL 119540, at *5 (N.D.Tex. March 10, 1998) (mem.) (analyzing lyrics, melodies, and song structure); Damiano v. Sony Music Entm't, Inc., 975 F.Supp. 623, 631 (D.N.J.1996) (analyzing instrumentation and melody under the extrinsic test); Sylvestre v. Oswald, 1993 WL 179101, at *4 (S.D.N.Y. May 18, 1993) (analyzing melody and lyrics under "striking similarity" test); Intersong-USA v. CBS, Inc., 757 F.Supp. 274, 280 (S.D.N.Y.1991) (analyzing chord progression, structure, pitch, and harmony under substantial similarity[16] test). In addition, commentators have opined that timbre, tone, spatial organization, consonance, dissonance, accents, note choice, combinations, interplay of instruments, basslines, and new technological sounds can all be elements of a musical composition. See Brent, supra, at 248-89; Stephanie J. Jones, Music Copyright in Theory and Practice: An Improved Approach for Determining Substantial Similarity, 31 Duq. L.Rev. 277, 294-95 (1993).
 
 
 21
 There is no one magical combination of these factors that will automatically substantiate a musical infringement suit; each allegation of infringement will be unique. So long as the plaintiff can demonstrate, through expert testimony that addresses some or all of these elements and supports its employment of them, that the similarity was "substantial" and to "protected elements" of the copyrighted work, the extrinsic test is satisfied. Swirsky has met that standard here.
 
 C. Scenes a Faire Analysis
 
 22
 The district court erred in finding the first and fifth measures of One to be unprotectable by reason of the scenes a faire doctrine.[17] Scenes a faire analysis requires the court to examine whether "motive"[18] similarities that plaintiffs attribute to copying could actually be explained by the common-place presence of the same or similar "motives" within the relevant field. See Smith, 84 F.3d at 1219. Under the scenes a faire doctrine, when certain commonplace expressions are indispensable and naturally associated with the treatment of a given idea, those expressions are treated like ideas and therefore not protected by copyright. See Rice I, 330 F.3d at 1175. The district court held that the first and fifth measures of One were not protected by copyright because Dr. Walser admitted in his deposition that the pitch sequence of the first measure of One' s chorus was more similar to the pitch sequence in the first measure of the folk song "For He's a Jolly Good Fellow" ("Jolly Good") than to the pitch sequence in the first measure of Thank God' s chorus.[19]
 
 
 23
 The evidence does not support the district court's ruling that the first measure of One is a scene a faire as a matter of law. The songs One and Jolly Good are not in the same relevant "field" of music; One is in the hip-hop/R & B genre and Jolly Good is in the folk music genre. Thus, comparing the first measure of One' s chorus to the first measure of Jolly Good does not tell the court whether the first measure of One' s chorus is an indispensable idea within the field of hip-hop/R & B. Further, even if One and Jolly Good were in the same genre of music, a musical measure cannot be "common-place" by definition if it is shared by only two songs.[20] One and Jolly Good are also written in different time signatures; One is in 4/4 while Jolly Good is in 6/8. Their chord progressions also differ (B-flat to B-flat(sus4) to B-flat in One and G in Jolly Good). This difference further undermines Carey's argument that the two measures are the same as a matter of law.
 
 
 24
 The district court also erred in finding the fifth measure of One to be a scene a faire as a matter of law. Carey introduced no independent evidence showing that measure five of One was more similar to Jolly Good than Thank God; she relied exclusively on Dr. Walser's opinion that measure five was "almost identical" to measure one of One. As we have already pointed out, on summary judgment, "almost identical" and "identical" are not equivalents, especially in light of Dr. Walser's transcriptions showing that measure five of One is different in pitch sequence from measure one of One. It is inappropriate to grant summary judgment on the basis of scenes a faire without independent evidence, unless the allegation of scenes a faire is uncontested. See Smith, 84 F.3d at 1220. It was contested here.
 
 
 Other Claims of Lack of Copyright Protection
 
 
 25
 Because we may affirm the grant of summary judgment on any basis supported by the record, see Newton, 349 F.3d at 594, Carey offers two additional arguments, not reached by the district court, why the summary judgment should be affirmed. Carey first argues that, wholly apart from the scenes a faire doctrine, the first measure of One' s chorus is not protectable because it lacks originality as a matter of law. Because One has a valid certificate of registration with the copyright office, however, Swirsky is entitled to a presumption of originality. See 17 U.S.C. § 410(c) (2003) (citing that presumption of originality extends for five years from date of copyright registration);[21] Three Boys, 212 F.3d at 488-89. Carey can overcome this presumption only by demonstrating that Swirsky's chorus is not original. See id.
 
 
 26
 In this circuit, the definition of originality is broad, and originality means "little more than a prohibition of actual copying." Three Boys, 212 F.3d at 489(quoting North Coast Indus. v. Jason Maxwell, Inc., 972 F.2d 1031, 1033(9th Cir.1992)). All that is needed to satisfy originality is for the author to contribute "something more than a `merely trivial' variation." Id.; see also ETS-Hokin v. Skyy Spirits, Inc., 225 F.3d 1068, 1073 (9th Cir.2000)(referring to "the low threshold for originality under the Copyright Act"). Carey argues that the first measure of One's chorus is not original because it is "substantially similar" to the first measure of Jolly Good.[22] See North Coast, 972 F.2d at 1033-34. The two measures may share the same pitch sequence, but they are not identical in meter, tempo, or key. There is, therefore, a triable issue whether there are more than "merely trivial" differences between the two works. Carey's contention that the first measure of Swirsky's chorus is not original as a matter of law accordingly fails.
 
 
 27
 Although the first measure of One' s chorus and the first measure of Jolly Good may share the same pitch sequence, they are not identical in meter, tempo, or key. There is, therefore, a triable issue whether there are more than "merely trivial" differences between the two works. Carey's contention that the first measure of Swirsky's chorus is not original as a matter of law fails.
 
 
 28
 Carey next argues that the first measure of One is a mere "musical idea," not protectable under the Copyright Act. Carey relies on Dr. Walser's testimony that the first measure of One was a "short musical idea." Carey's reasoning is fallacious for a number of reasons, the most basic being that a musicologist is not an expert on what the term "idea" means under the copyright laws. Labeling something as a "musical idea" does not necessarily bear on whether it is also an "idea" under the copyright laws and unprotectable for that reason.
 
 
 29
 No federal court has stated that a musical motive is not protectable because it is an idea. Nor does the "musical idea" of the first measure of Swirsky's chorus lack protection because of its brevity. Although it is true that a single musical note would be too small a unit to attract copyright protection (one would not want to give the first author a monopoly over the note of B-flat for example), an arrangement of a limited number of notes can garner copyright protection. See Elsmere Music, Inc. v. Nat'l Broad. Co., 482 F.Supp. 741, 744 (S.D.N.Y.1980) (finding that four notes were substantial enough to be protected by copyright); Santrayll v. Burrell, 1996 WL 134803, at *2 (S.D.N.Y. Mar.25, 1996) (mem.order) (finding that the repetition of the word "uh-oh" four times in a distinctive rhythm for one measure is sufficiently original to render it protectable under the copyright laws). This Court has stated that "[e]ven if a copied portion be relatively small in proportion to the entire work, if qualitatively important, the finder of fact may properly find substantial similarity." Baxter v. MCA, Inc., 812 F.2d 421, 425(9th Cir.1987). The melodic line in the first measure of One is seven notes long. It cannot be said as a matter of law that seven notes is too short a length to garner copyright protection. We therefore reject this challenge to the protection of the first measure of One's chorus.
 
 
 Evidentiary Arguments
 
 
 30
 Swirsky challenges two evidentiary rulings of the district court, which we address because the issues may arise again in further proceedings on remand. We review for abuse of discretion the district court's decision to admit or exclude evidence. See Los Angeles News Serv. v. Tullo, 973 F.2d 791, 800 (9th Cir.1992).
 
 A. The Work Session Tape
 
 31
 The district court did not abuse its discretion in refusing to admit a tape of Carey's "work session" that Swirsky offered as evidence of direct copying. Although there is no explicit ruling by the district court on Swirsky's offer to introduce the tape other than a passing reference in the minute order denying Swirsky's motion for reconsideration, that omission is not in and of itself an abuse of discretion. See GoTo.com, Inc. v. Walt Disney Co., 202 F.3d 1199, 1209-1210 (9th Cir.2000) (stating that a district court's silence in regard to a ruling is not abuse of discretion if the record supports the court's decision).
 
 
 32
 The work session tape that Swirsky sought to introduce demonstrated only that Carey came into the studio with the melody to the chorus of Thank God in her head. The fact that a composer or singer has a melody in her head does not necessarily demonstrate direct copying; the melody could easily be the product of her own creative processes, conscious or subconscious. It was thus not a clear error of judgment for the district court to refuse to admit the work session tape.
 
 B. The Bassline Transcriptions
 
 33
 The district court did not abuse its discretion in admitting defense expert Anthony Ricigliano's bassline transcriptions of One and Thank God. Swirsky objected to the admission of Ricigliano's transcriptions on the grounds of lack of personal knowledge or foundation, hearsay, lack of authentication, and relevance. Ricigliano's transcriptions, however, appear to have been admitted for the limited purpose of showing what the two choruses' basslines "looked like" before being reduced by Dr. Walser.[23] In his deposition, Dr. Walser testified that Ricigliano's bassline transcriptions were accurate. Whether Dr. Walser's methodology was complete and accurate in comparing the two songs' choruses is obviously relevant. Further, Ricigliano's transcriptions were not introduced to prove the truth of the matter asserted, but simply to give the court a complete transcription of the basslines. The transcriptions are therefore not hearsay. See Fed.R.Evid. 801(c). Finally, because Swirsky's own expert, Dr. Walser, admitted the accuracy of Ricigliano's transcriptions, there was no foundation or authentication problem. See Fed.R.Evid. 901(a) and (b)(1); Fed.R.Civ.P. 56(e). We therefore reject Swirsky's evidentiary challenges.
 
 
 Conclusion
 
 
 34
 We conclude that Swirsky's expert adequately explained his methodology and provided "indicia of a sufficient disagreement concerning the substantial similarity of two works" so that the issue of the substantial similarity of the two choruses should have been presented to a jury. Brown Bag, 960 F.2d at 1472 (internal quotations and citation omitted). We further conclude that the district court erred in ruling as a matter of law that measures one and five of One were scenes a faire. Finally, we reject Carey's contention that these measures were unprotectable as a matter of law on the grounds that they were unoriginal or mere musical ideas. We therefore reverse the summary judgment and remand this case to the district court for further proceedings consistent with this opinion.[24]
 
 
 35
 REVERSED and REMANDED.
 
 
 
 Notes:
 
 
 [1]
 Swirsky also claims that the piano introduction toThank God infringes Swirsky's copyright because the introduction is essentially a piano version of Thank God' s chorus. To the extent this is the case, Swirsky's claim that the introduction infringes his copyright depends on whether Thank God's chorus is substantially similar to One' s chorus.
 
 
 [2]
 On this appeal the parties present issues related only to the copyright infringement claim
 
 
 [3]
 A number of the people involved in recordingOne were also involved in the recording of Thank God. Both songs were mastered by Bob Ludwig at Gateway Mastering, produced by Sony Music Entertainment, and distributed through Columbia Records. Jermaine Dupri served as a producer to both albums and Kandi Burress, one of the former members of Xscape, co-wrote the song "X-Girlfriend" with Carey for the "Rainbow" album.
 
 
 [4]
 Although the extrinsic test examines the similarity of ideas and expression, it must be kept in mind that ideas by themselves are not subject to copyright protection; only theexpression of ideas is. See Rice I, 330 F.3d at 1174.
 
 
 [5]
 Dr. Walser did not compare sheet music in arriving at his expert opinion. NeitherOne nor Thank God was originally composed using sheet music.
 
 
 [6]
 A bassline (often written "bass line") is defined as "[t]he succession of the lowest notes in a passage (or composition) which `support' the other parts and are mainly responsible for the harmonic progression." Grove Music Online,at http://www.grovemusic.com.
 
 
 [7]
 Dr. Walser identified the style as "contemporary R & B or `urban' music."
 
 
 [8]
 Dr. Walser stated that text-setting choices mean that some pitches are repeated in one song while they are held in another
 
 
 [9]
 Melody is a function of both pitch (i.e. the steps, or tones, on the scale) and rhythm (i.e. time values and relationships between the notes) of a series of notes
 
 
 [10]
 Carey introduced bassline transcriptions of the two choruses made by Carey's expert, Anthony Ricigliano, to show the notes that Dr. Walser had omitted from his reduction
 
 
 [11]
 As we discuss more fully below,scenes a faire are common expressions indispensable to the expression of particular ideas in a relevant field; they are treated as unprotectable by copyright, in the manner of ideas. See Smith, 84 F.3d at 1219.
 
 
 [12]
 The district court did not separately analyze measures four, six and seven. The district court accepted Dr. Walser's testimony that the fourth measures of the two songs' choruses were "dramatically different." The district court found that it did not need to analyze measures six and seven separately because Dr. Walser had opined that they were "almost identical" to measures one, two and three
 
 
 [13]
 In fact, concentration solely on pitch sequence may break music down beyond recognition. If a musician were provided with a group of notes identified only by numerical pitch sequences, he or she could play that music a number of different ways, none of them being substantially similar to each other. In order to perform a song exactly, the musician would need information about key, harmony, rhythm, and tempo — the type of information not included in the district court's comparison
 
 
 [14]
 The district court also erred in not separately analyzing measures six and seven of both choruses. Although Dr. Walser stated in his opinion that measures six and seven ofOne were "almost identical" to measures two and three of One, the district court was bound to view the evidence in the light most favorable to Swirsky. See Smith, 84 F.3d at 1218. The court was not free to conclude that, because measures two and three of Thank God were not substantially similar to corresponding measures of One, measures six and seven could not be substantially similar to those of One. In that sense, "almost identical" cannot be equated with "identical," especially when Dr. Walser's transcriptions showed measure six of One to be different in pitch sequence from measure two of One.
 
 
 [15]
 Literary works, such as books, film, and television shows, are more easily broken into a small number of discrete elements to analyze, namely "plot, themes, dialogue, mood, setting, pace, characters and sequence of events."Metcalf, 294 F.3d at 1073 (quoting Kouf, 16 F.3d at 1045).
 
 
 [16]
 The Southern District of New York's substantial similarity test does not differentiate between extrinsic and intrinsic analysis
 
 
 [17]
 The district court did not separately analyze measure five because Dr. Walser had opined that it was "almost identical" to measure one
 
 
 [18]
 Motive as used here means "an element or a component in a decorative composition." ROGET'S II: THE NEW THESAURUS, THIRD EDITION (1995),available at http://www.bartleby.com/62/47/M1004700.html (last visited May 4, 2004).
 
 
 [19]
 Carey's attorney told Dr. Walser to ignore rhythm when comparingOne to Jolly Good.
 
 
 [20]
 Although Carey also argues that the pitch sequence of the first measure ofOne' s chorus was highly similar to the first measure of the folk song "The Bear Went Over the Mountain" ("Bear Went"), we note that Bear Went and Jolly Good are musically identical songs.
 
 
 [21]
 The copyright was registered in August 1998 and this action was filed in November 2000
 
 
 [22]
 Carey also argues that the first measure ofOne is substantially similar to the first measure of Bear Went. Because Bear Went is exactly the same musically, albeit not lyrically, to Jolly Good, the comparison of One to Jolly Good applies with equal force to the comparison between One and Bear Went as well.
 
 
 [23]
 The district court never "directly" used Ricigliano's transcriptions to compare the choruses ofOne and Thank God, only to discount Dr. Walser's expert methodology.
 
 
 [24]
 Because we reverse the district court's grant of summary judgment, Swirsky's challenge to the denial of his motion to reconsider is mootSee Flowers v. First Hawaiian Bank, 295 F.3d 966, 969 (9th Cir.2002).